**MODULAR CINEMAS OF AMERICA, INC., a corporation, Plaintiff,**

**v.**

**MINI CINEMAS CORPORATION, a corporation, Defendant.**

**Civ. A. No. 69 3115.**

United States District Court,
S. D. New York.

Sept. 19, 1972.

Francis D. Thomas, Jr., of Bacon & Thomas, Washington, D. C., for plaintiff.

Arthur L. Goldstein, New York City, for defendant.

EDELSTEIN, Chief Judge.

## OPINION

This is a civil action for infringement of a trademark registered in the United States Patent Office, brought pursuant to Section 32 of the Lanham Act, 15 U.S.C. § 1114. This court has jurisdiction over the subject matter under 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a).

Plaintiff Modular Cinemas of America is a corporation organized and existing under the laws of the State of Georgia and having its principal place of business in Atlanta, Georgia. It is engaged in the business of operating motion picture theaters under the name "mini cinema," some of which it owns and others which are under franchise to it.

Defendant, Mini Cinema Corporation is a corporation organized and existing under the laws of the State of New York and has its principal place of business in New York, New York. Defendant operates one motion picture theater in the Times Square area of New York City.

Briefly stated, it is plaintiff's contention that notwithstanding its alleged superior common law and statutory rights in the service mark mini cinema, the defendant with constructive and actual notice has adopted and continues to use the identical name to identify its own theater which has resulted in the infringement of plaintiff's mark.

Therefore, plaintiff requests that defendant be permanently enjoined from the use of the name mini cinema; that monetary damages, including profits, be awarded; that defendant be required to destroy any materials bearing the designation; and that costs, including reasonable attorney fees, be awarded.

The defendant has denied all of the material allegations contained in the complaint except to admit that it has used and continues to use the term mini cinema. It contends that such use is proper. More particularly, defendant asserts:

(1) that its concurrent use does not constitute an infringement in that there is no likelihood of confusion in the relevant market;

(2) that it uses the term in a descriptive sense and only for the purpose of describing the nature of its product, namely, and extremely small motion picture theater;

(3) that the term mini cinema as used by plaintiff is descriptive and therefore incapable of exclusive appropriation by anyone;

(4) that plaintiff is not entitled to injunctive relief absent an operation in New York; and

(5) that under the Lanham Act, 15 U.S.C. § 1115(b)(5), defendant has a valid defense in that it adopted the mark without actual knowledge of plaintiff's prior use but before plaintiff's registration—this defense being limited under the statute to the area of prior use.

Thus, defendant prays that the complaint be dismissed.

In addition, defendant has asserted a counterclaim requesting that plaintiff's registration and service mark be cancelled and revoked on the ground that the term mini cinema is purely descriptive. Plaintiff contests this assertion and requests that the court adjudicate that its mark is valid and that the counterclaim be dismissed.

On May 22, 1970, plaintiff moved for a preliminary injunction to preclude defendant's use of the name mini cinema. After hearing argument on June 23, 1970, the court reserved decision and ordered the trial of this action, which commenced on July 27, 1970, and was concluded July 28, 1970. On November 18, 1970, plaintiff moved to reopen the trial record for the limited purpose of proffering certain subsequently acquired evidence. After argument on December 17, 1970, the court granted the motion.

At the time of trial plaintiff operated six theaters located in Georgia and Tennessee and pursuant to its policy of promotion and expansion it was involved in various stages of developing additional theaters. Plaintiff's theaters exhibit films which are predominantly geared

toward what is known in the trade and by the public as "family" audiences. All of its operating theater sites are in shopping centers, situated in suburban or semi-suburban metropolitan locations. None of plaintiff's theaters is called mini cinema only; rather, the name of the shopping center in which it is located is always employed, together with its mark. Two examples are Ainsley Mini Cinema, and Peach Tree Mini Cinema. The mark as registered and used is comprised of a circular geometric figure underneath which appears the words "mini cinema" (small case) also underneath one another.

Plaintiff's use in commerce of the designation mini cinema as a service mark was initiated at least as early as April 5, 1968, and has continued without interruption to the present. (R. 12).[1] Plaintiff formally registered the mark with the U. S. Patent Office on the Principal Register on March 11, 1969, (Registration No. 866,662; Class 107 for operating motion picture theaters). (Ex. 17).[2] The word "cinema" is disclaimed apart from the mark as shown.

As stated, defendant is a corporation operating a single theater located in the Time Square area of Manhattan, New York. On April 23, 1968, it filed a certificate of corporation in New York State under the name "Mini Cinema Corporation." (Ex. C. & D; R. 104). Thereafter it became the lessee of what it thought to be the smallest motion picture theater in New York City. Between June 1968 and April 1969, in preparation for commencing business operations, it advertised its then impending opening in various New York City newspapers (Ex. L, M, O; R. 115, 123), erected a theater marquee which included the words mini (all caps) cinema (no caps, stylized letters) (R. 156,162), booked films for future presentation (R. 118) and contracted with theater service agencies (such as a concessionaire).

On April 30, 1969, defendant opened its doors to the public. As characterized by defendant, its features are consistently and exclusively for "adults only" and its entertainment includes "live dance performances" between film exhibitions. (Defendant's post-trial memorandum at page 2; R. 123).

With these findings in mind we will now consider the first issue in this case —plaintiff's claim to ownership of the mark in question and defendant's closely associated claim of "innocent user."

■■ It is an axiomatic principle of trademark law that priority in adoption and actual use of a name or designation, as a trademark, is the essential criterion upon which ownership is based. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916). It is this priority in time of trademark use, in commerce, which confers the quintessential right of exclusiveness and hence "ownership" upon the user. Registration confers certain procedural advantages upon a successful applicant; particularly, it is prima facie evidence of the validity of the registration, of the registrant's ownership of the mark, and its exclusive right to the use of it in commerce. 15 U.S.C. § 1057(b). Applying these principles to the case at bar, it is indisputable that plaintiff is the prior user and hence the exclusive owner even if the court accepts defendant's asserted earliest date of use—its date of incorporation—as applicable.

■■ To avoid this fatal conclusion defendant has invoked the doctrine of innocent user as embodied in section 1115(b)(5) of Title 15, U.S.Code, which provides a defense against infringement to a defendant who (1) adopts a mark without actual knowledge of a registrant's prior use, (2) if defendant has continuously "used" the mark from a date prior to plaintiff's registration. Such a defense, however, applies only "for the area in which such continuous

---

1. "R—" references are to pages in the trial transcript.

2. "Ex—" references are to exhibits in evidence.

prior use is proved." The theory upon which this statutory exception rests is that registration provides constructive notice to the world of a registrant's claim of ownership. Therefore, one who adopts and uses a mark after another does so, without knowledge, but prior to the latter's registration, is entitled to limited superior rights.

As stated, plaintiff's registration was issued on March 11, 1969; the parties have stipulated that actual notice did not occur before March 21, 1969.[3] Thus, the jugular issue becomes whether defendant "adopted" and "used" the name mini cinema prior to the date of registration. Defendant argues that its use began on April 23, 1968, by its act of incorporation (see defendant's proposed finding of fact No. 5), whereas plaintiff claims that use within the meaning of § 1115(b)(5) did not occur until defendant's theater opened for business on April 30, 1969.

■ The plaintiff's position as to the statutory meaning of use is supported both in theory and by case law. It is a hornbook rule of law that a trademark must be appurtenant to some existing enterprise to which it is related; it can not exist in gross. No rights are acquired through mere invention or creation of a name or symbol, or through mere adoption or the intention to use it. The gist of trademark rights is its actual use in trade. As one commentator has stated:

"There is no such thing as property in a trademark except a right pertaining to an *established* business with which the mark is employed." Seidel, Trademark Law and Practice, § 3.01 at page 39. (emphasis added).

This is not to say that any particular time period of use is a prerequisite to assert trademark rights, nor that there be an instance of the actual sale of a product or service, so long as an established business exists and the mark is used to identify the source of trade.

Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 542 (2d Cir. 1956). "It is axiomatic, however, that use and not priority of incorporation is decisive." 3 Callman § 76.1 at page 275.

■ Further, the mere advertisement of a product does not constitute trademark use, Victor Tool & Machine Corp. v. Sun Control Awnings, Inc., 299 F. Supp. 868 (E.D.Mich.1968), affirmed 411 F.2d 792 (6th Cir. 1968); Powermatics, Inc. v. Globe Roofing Products, 341 F.2d 127, 52 CCPA 950 (1965). And although this rule has been relaxed somewhat by statutory definition in the case of service marks (15 U.S.C. § 1127), service mark use nevertheless is still predicated upon the existence of an established operating business. For only then does a mark function to identify the source of one's trade in the marketplace. 4 Callman § 98.4(b) at page 669.

■ Colloquially speaking, so far, so good, for the plaintiff. But the resolution of this case becomes more difficult when the critical question—that of infringement—is considered. There has developed a trademark law maxim that each case must be decided upon its peculiarities. This is not to state, however, that we are without guidelines. The acid test of infringement is, of course, "likelihood of confusion, mistake or deception." 15 U.S.C. § 1114. "Likely," removed of all its adornments, means probably. The remote possibility of occasional confusion in those who observe less than ordinary care under the circumstances does not concern us. This circuit has developed an extensive list of criteria useful in making an assessment of likelihood of confusion. Not all of these are always relevant or equally emphasized in each case. These include the degree of similarity between the marks in appearance, phonetics and suggestion; the relative nature of the products involved (in this case services); the manner in which the services are provided; their respective trade channels; the de-

3. Precisely, defendant was notified "during the week prior to March 28, 1969."

gree of care likely to be employed by a consumer due to the price involved; the frequency and casualness of the purchase; whether defendant is deliberately trafficking in plaintiff's mark; the "strength" of plaintiff's designation; the likelihood that a prior owner will bridge a disparate geographical market or close a product or subproduct gap; and a catalogue of others which do not pertain to the issues here. Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961); Triumph Hosiery Mills, Inc. v. Triumph International Corp., 308 F.2d 196 (2d Cir. 1962); King Research, Inc. v. Shulton, Inc., 454 F.2d 66 (2 Cir., 1972).

■■■■■ The question of confusing similarity between plaintiff's and defendant's use of the term mini cinema is one of fact, G. D. Searle & Co. v. Chas. Pfizer & Co., Inc., 231 F.2d 316 (7th Cir. 1956), Venetian Aire Corp. of America v. A & P Import Co., 302 F. Supp. 156 (S.D.N.Y.1969) and the court finds that upon the existing record there is no present likelihood of confusion, mistake or deception which would support plaintiff's request for injunctive relief. This determination is a relatively close one in view of several ponderables which shall be indicated; nevertheless, plaintiff's rights have not yet, and may never, ripen to the point where equitable relief is indicated.

To be sure, both parties utilize the words mini cinema to denominate their theaters, yet they are far from identical. It should be recalled that in conjunction with its mark, plaintiff uses the name of the shopping center[4] in which each of its theaters is located together with a prominent geometric design. Additionally, the term mini cinema is relatively weak and there has been no evidence that defendant has sought to avoid paying its own way by intentionally adopting the same words to siphon off plaintiff's trade.

Of considerable importance here is the respective nature of what is offered for sale by the parties and to whom it is offered. Plaintiff's film exhibition policy is to present predominantly "first run" films directed to the suburban family audience. Defendant, on the other hand, provides its audiences with a steady diet of what may be described euphemistically as adult-only erotica, referring to films consisting substantially of sexual physical encounter and sexual fantasy. Its admission policy limits its audience exclusively to adults; its patrons are predominantly males. Also, unlike plaintiff, defendant advertises and features live exotic female dance performances between film showings. Moreover, defendant's sole enterprise is situated in a highly commercial urban section of New York City—Times Square—in an area saturated with sex entertainment establishments. See Code v. Seattle Theater Corp., 162 Wash. 379, 298 P. 432 (1931).

This court also has placed emphasis upon the fact that movie houses promote the films which they exhibit as a means of attracting audiences rather than their particular theater name. And of greater importance, movie goers are relatively sophisticated purchasers whose decision to patronize a particular place of business is based substantially upon the feature offered rather than the name of a particular theater. This absence of reliance upon labels by relatively informed consumers, together with two clearly distinguishable sub-product markets (family films vs. adult only) are significant factors which render confusion as to source less than likely. Too, there was testimony that it is a common oc-

---

4. In one noted case the trial judge resolved the confusion caused by the simultaneous use of the term "Food Fair" when applied in the highly competitive retail grocery industry by issuing a decree which permitted defendant to continue to use the name with the slight (yet important) differentiation of "New England Food Fair." Food Fair Stores v. Food Fair, 83 F.Supp. 445 (D.Mass.1948) remanded in part in Food Fair Stores, Inc. v. Food Center, Inc., 356 F.2d 775 (1st Cir. 1966).

currence in the movie theater industry for two or more identically named theaters under different ownership to coexist in the same city. Regarding New York City, the following examples were given: Plaza, Criterion, Victoria, Globe, (R. 171)—all of which tends to indicate that film goers and persons involved in the film industry are aware of the fact that theaters with common names do not signify common sources, thereby further reducing the reliance upon labels and thus the likelihood of confusion.

Another factor which is of critical importance in determining whether injunctive relief is warranted here is the geographical disparity which exists between the parties' respective markets. At the time of trial plaintiff's unit closest to New York City was in Tennessee—a distance of more than 500 miles. While some recognition is to be given to our mobile style of living, it is common knowledge, as fortified by common sense, that movie patrons generally do not travel far in order to purchase film entertainment.

Plaintiff argues that the disparity of markets here is legally inconsequential in light of its prior federal registration and asserted right (under trademark doctrine) to protection within the zone of its natural geographic expansion.

■ Plaintiff is correct in noting that a junior user whose situs is totally distinct from a superior mark holder's territory nonetheless will be enjoined *if* the likelihood of confusion is present. See, for example, Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79 (3rd Cir. 1958) (Chicago Pump Room obtained injunction against Philadelphia restaurant); Stork Restaurant v. Sahati, 166 F.2d 348 (9th Cir. 1948) (New York Club enjoined San Francisco Tavern); Lincoln Restaurant Corp. v. Wolfies Rest., Inc., 291 F.2d 302 (2d Cir. 1961) (Wolfie's restaurant of Miami Beach over Wolfie's of Brooklyn). The record here, however, does not support the application of that principle.

It may be noted at the other extreme that where two similar businesses operate under identical marks, in a common bailiwick, but again without the likelihood of confusion—each in fact individually known in the marketplace—injunctive relief is unwarranted. (See Hyde Park Clothes, Inc. v. Hyde Park Fashions, Inc., 204 F.2d 223 (2d Cir. 1953) ("Hyde Park" for men's clothes sold nationally held not to conflict with "Hyde Park" for women's clothes sold nationally.))

■ Under the Lanham Act, registration provides nationwide constructive notice of a claim of ownership and may afford protection in areas in which the registrant has not actually used its mark. Stated differently, the Lanham Act's elimination of the common law defenses of good faith and lack of knowledge preclude a junior user from ever acquiring the right to exclude a registrant's use. The question of permissible concurrent use, however, turns upon a subtle, yet meaningful distinction. In Dawn Donut Company v. Hart's Food Stores, Inc., 267 F.2d 358 (2d Cir. 1959), this Circuit stated that a prior registration by one, coupled with a simultaneous use by another, does not entitle the former to the issuance of an injunctive decree, *per se*. The court stated (at page 364):

> "The Lanham Act, 15 U.S.C.A. § 1114, sets out the standard for awarding a registrant relief against the unauthorized use of his mark by another. It provides that the registrant may enjoin only that concurrent use which creates a likelihood of public confusion as to the origin of the products in connection with which the marks are used. Therefore if the use of the marks by the registrant and the unauthorized user are confined to two sufficiently distinct and geographically separate markets, with no likelihood that the registrant will expand his use into defendant's market, so that no public confusion is possible, then the registrant is not entitled to

enjoin the junior user's use of the mark." (footnote and citations omitted).

The court commented on the facts therein by stating that "if expansion were probable, then the concurrent use of the marks would give rise to the conclusion that there was a likelihood of confusion." This pronouncement was predicated upon the court's determination that defendant's use of the mark "Dawn," as applied to doughnuts, in plaintiff's zone of natural expansion, would be likely to cause confusion.

Relying upon *Dawn,* another court in making a similar ruling stated:

"A registrant's remedies are thus limited, and it has no presently enforceable rights in an area to which there is no presently provable probability of such expansion of the registrant's services or reputation as will create a likelihood of confusion."

\* \* \* \* \* \*

"However, if future expansion of the plaintiff's business or reputation does occur *and confusion becomes likely,* the rights of the plaintiff are definitely superior to those of the defendants." John R. Thompson Co. v. Holloway, 366 F.2d 108, 114, 116 (5th Cir. 1966). (emphasis added).

Applying these principles to the case at bar, the court finds that plaintiff is not presently entitled to injunctive relief since such a remedy may not be provided simply to eliminate the possibility of a remote, future injury. Admittedly, zones of probable expansion are sometimes difficult to demarcate. What is possible may be equally improbable. Plaintiff is a newly born corporation; its present rate of "natural expansion" into New York City has not been demonstrated with any degree of persuasion. It presently operates six theatres in Tennessee and Georgia. Others are under construction in Georgia, Tennessee, Texas, Michigan, South Carolina and Illinois. It has sold franchises in Georgia and Ohio and claims to be negotiating still others. While it speaks optimistically of expansion into the New York City area, the potentialities for its entry there appear to be improbable. In the past the closest it has come to the metropolitan area has been to prospective sites in Freehold, Millburn, Chatham and Berkely Heights, New Jersey, which range from approximately 35 to 70 miles from Times Square; however, it later seized upon release clauses to escape leasing agreements due to cost overruns and a tight money market. There is testimony in the record, by way of an out-of-court admission by plaintiff's vice-president and chief film buyer, that plaintiff would never enter the New York City market because of the strong competitive conditions there. (R. 125, 160). The realities of commercial life, then, can not be overlooked in surveying the outer limits of plaintiff's growth.[5] It is worth repeating that plaintiff's intended growth, at best, if accomplished, would be confined to suburban New York City under a different but similar name reaching predominantly a different clientele in a distinct subproduct market.

By way of comparison and illustration the Third Circuit has taken a considerably more restrictive approach to granting injunctive relief in a similar situation. In Holiday Inns of America, Inc. v. B. & B. Corporation, 409 F.2d 614 (3rd Cir. 1969) equitable relief was refused to the nationally advertised and widely known motel chain, then comprised of 830 motel facilities, until the plaintiff actually began construction of a unit in the disputed area, the Virgin Islands—a popular vacation site—despite the court's explicit finding that upon expansion, confusion was a virtual certainty. See also Casual Corner Associates, Inc. v. Weinel, 309 F.Supp. 705

---

5. *Cf.* Food Fair Stores v. Food Fair, *supra*; see Thompson v. Holloway, *supra,* wherein "present" relief was denied to a plaintiff which operated 37 restaurants in states bordering the subject area.

(S.D.Florida 1970); Thompson v. Holloway, *supra*; American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5th Cir. 1963).

Finally, plaintiff claims that its mark is being tarnished due to the nature of defendant's trade. It categorizes defendant as the operator of a "sexploitation house," exhibiting films which are exclusively of the unsavory lascivious variety. Defendant counters by quoting several titles which have appeared on plaintiff's marquees, claiming those films are equally salacious. Plaintiff retorts by noting that 90 percent of its films are "family" movies and that its remaining films, adult motion pictures, at least have a rating—"X." [6]

In balancing conflicting interests, courts have considered the possible damage to a mark holder's reputation as a factor in deciding whether injunctive relief is warranted. One court has recently stated the correct standard this way:

> "If the goods or services of the alleged infringer are so related to those of the prior user that it would be reasonable to conclude that they come from the same source, then protection is warranted in order to prevent the 'good or ill repute of the one [from being] visited upon the other.'" Sears, Roebuck & Co. v. Allstate Driving School, Inc., 301 F.Supp. 4, 12 (E.D.N.Y.1969).

See also S. C. Johnson & Son v. Johnson, 175 F.2d 176, 180 (2d Cir. 1949).

And even if a finding of likelihood of confusion is not a prerequisite to the consideration of possible damage to plaintiff's reputation, its concern here is highly conjectural. Plaintiff has not proved that its own trade reputation is being debased to its economic detriment by defendant in the eyes of its clientele, its existing or prospective franchisees, film industry personnel, or the financial community. Plaintiff's own categorization implies that the defendant consist-

ently seeks to attract and capture a different market.

Additionally it should be noted that courts have limited the focus of their inquiry in this area to a comparison of the inferiority of a defendant's performance with a plaintiff's. See Hyde Park Clothes, Inc. v. Hyde Park Fashions, Inc., 204 F.2d 223, 226 (2d Cir. 1953). Plaintiff's contentions are unclear in this regard for it does not claim that it is debased due to the quality of defendant's performance as compared with similar adult-only films. To the contrary, plaintiff seems to imply that its reputation is blemished simply because defendant renders the kind of service that it does. It has not advanced this contention as an independent basis for injunctive relief and the court need not reach this novel legal question on its own for the evidence does not establish a predicate for such a claim.

Turning now to defendant's case, it has presented the customary panoply of trademark defenses. The statutory defense of innocent user, 15 U.S.C. § 1115(b), has been considered already and found to be lacking.

▮▮▮ There remains the assertion that plaintiff's mark is purely descriptive and therefore "in the public domain;" this contention is also the subject of defendant's counterclaim requesting the cancellation of plaintiff's registration. It is also untenable and need not delay us long.

▮▮▮ A mark must be sufficiently original to indicate the origin or source of a product and not merely its physical characteristics or function. Words must be used in a "trademark sense" in order to constitute a mark. This means they must function in a fanciful, imaginative manner when perceived by the public. Trademark words may be "suggestive" so long as they are not purely adjectival. If words which do not sufficiently identify a source were to be protected, that would straightjacket common speech and

---

6. None of these films was offered into evidence by either side, although several still pictures and billboard type advertisements were.

thereby would inhibit commerce, which clearly is not the purpose of trademark law.

Plaintiff's claim that the words mini cinema are markable must succeed. Since its mark is registered on the Principal Register with the U.S. Patent Office it is presumptively valid, for the decision to accept a registration application has considerable significance in this circuit. Aluminum Fabricating Co. v. Season-All Window Corp., 259 F.2d 314, 316 (2d Cir. 1958).

While case comparisons are only marginally helpful to both sides in a descriptiveness inquiry, it is noteworthy that one federal court has upheld as valid a somewhat similar term, "Mini-Tramp," as applied to trampolines. Nissen Trampoline Co. v. American Trampoline Co., 193 F.Supp. 745 (S.D.Iowa 1961).

The case law cited by defendant is clearly inapposite and distinguishable. Reliance upon the well-known "Shredded Wheat" case, Kellogg Company v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) is misplaced by defendant for there the Court found that the public employed that term as the generic name for the product in question. A similar conclusion was reached in the "turbodiesel" case, Cummins Engine Co. v. Continental Motors Corp., 359 F.2d 892, 53 CCPA 1167 (1966). In Roselux Chemical Co. v. Parsons Ammonia Co., 299 F.2d 885, 49 CCPA 931 (1962), the evidence established what was obvious, namely, that the word "sudsy" is commonly used by the public to describe ammonia.

Theatergoers, however, do not refer to small theaters as mini cinemas (or large ones as maxis). And while mini cinema is somewhat suggestive,[7] it is not primarily descriptive[8] of the functional feature of plaintiff's service (as would be the case of a mini radio or mini camera). Moreover, plaintiff expressly states that it does not claim an exclusive right to the prefix "mini" and the word "cinema" as used individually, but rather predicates its right on the use of these words conjunctionally. Additionally these words have a somewhat distinctive cadence when used in combination with each other. Plaintiff's designation, then, is "catchy" enough to be entitled to trademark status. Accordingly, the defense is found to be without merit and the counterclaim is dismissed.

In conclusion, plaintiff's prayer for injunctive relief under the circumstances of this case must be denied. However, its right to expand its operation can not be curtailed merely by defendant's presence in the Times Square area. Defendant's concurrent use of the term mini cinema can not ripen into a license to exclude plaintiff from that area since it has failed to establish a satutory defense under 15 U.S.C. § 1115(b).

Plaintiff's complaint is dismissed without prejudice. Defendant's counter claim is dismissed with prejudice.

---

7. Plaintiff concedes this point.

8. It is footnoteworthy that Americans do not commonly use the word cinema interchangeably with moving picture theater.